UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID E. SMITH,                         )
                                        )
            Petitioner,                 )
                                        )
      vs.                               )        Case No. 4:19-cv-01913-MTS
                                        )
STANLEY PAYNE,                          )
                                        )
            Respondent.                 )

**MEMORANDUM AND ORDER**

This matter is before the Court on Petitioner David E. Smith's Petition under 28 U.S.C.

§ 2254 for writ of habeas corpus. Doc. [1]. For the following reasons, Petitioner's § 2254 petition

is denied.

**I.      Procedural Background**

Petitioner is currently incarcerated at the Eastern Reception Diagnostic Correctional

Center in Bonne Terre, Missouri. In November 2014, in the Circuit Court of St. Louis County,

Petitioner was found guilty after a jury trial of one count of assault in the first degree, one count

of robbery in the first degree, and two counts of armed criminal action. Following Petitioner's

conviction, he was sentenced as a prior and persistent offender to consecutive terms of life

imprisonment for the assault and one of the counts of armed criminal action, and concurrent

sentences of life imprisonment for robbery and the other count of armed criminal action. Doc.

[27-18] at 2. On April 5, 2016, Petitioner's convictions and sentences were affirmed on direct

appeal in *State v. Smith*, 491 S.W.3d 286 (Mo. Ct. App. 2016).

On July 1, 2016, Petitioner filed a premature Missouri Supreme Court Rule 29.15 motion

for post-conviction relief. On January 18, 2017, through appointed counsel, Petitioner filed a

timely amended motion. After an evidentiary hearing, the motion court denied Petitioner's Rule

29.15 motion for post-conviction relief. On May 7, 2019, that judgment was affirmed on appeal. *Smith v. State*, No. ED106564 (Mo. Ct. App. 2019); Doc. [27-18]. On July 10, 2019, Petitioner filed a petition under 28 U.S.C. § 2254 for writ of habeas corpus.

## II.    Factual Background

On May 10, 2013, Petitioner discussed a robbery with Shenee Edwards, Lindsay Dames, Kevin Nolfo, and Jake Dwyer in Room 235 of the Northwest Airport Inn in Bridgeton, Missouri ("the motel"). Doc. [27-4] at 121. At the time, Petitioner, Edwards, and Dames were high on drugs. *Id.* at 117. Dames testified that Petitioner asked her if she knew a person he could rob. *Id.* Dames suggested one of her friends ("Victim") because she believed they had just received a paycheck from work. *Id.* at 118. Additionally, Victim and Dames already planned to meet at a nearby Domino's Pizza that night. *Id.* at 114; Doc. [27-3] at 38. When Petitioner asked Dames if she believed Victim would attempt to defend himself, Dames said she did not think he would. Doc. [27-4] at 119.

Dwyer testified that he and Nolfo declined when Petitioner asked them if they wanted to participate in the robbery. Doc. [27-4] at 50–51. Dames and Edwards then left the motel to meet Victim around 9 p.m. *Id.* at 125. Victim walked from his home to Domino's to meet up with Dames and Edwards. Doc. [27-3] at 39. At Domino's, Dames and Edwards ordered food and Victim paid for it. *Id.* at 41; Doc. [27-4] at 125. After Dames and Edwards got their food, Victim accepted Dames' invitation to accompany them to the motel. Doc. [27-3] at 41–42; Doc. [27-4] at 126–27. They walked over to the motel together around 10 p.m. Doc. [27-4] at 128.

Before arriving at the motel, Dames called Dwyer to tell him that he and Nolfo needed to leave the room because they did not want to join in the robbery. Doc. [27-4] at 52, 129. Dwyer responded to Dames via text message stating that Petitioner was hiding in the bathroom. *Id.* at 57, 133.

Victim testified that once he, Dames, and Edwards got to the motel, Dames and Edwards left him alone sitting on the living room couch.[1] Doc. [27-3] at 50–51. While Dames and Edwards stood in the hallway, Petitioner came out of the bathroom with a knife in his hand, started running towards Victim, and yelling curse words. *Id.* at 57, 64. Victim testified that Petitioner then hit him in the face with his elbow and used the knife to stab Victim close to his heart. *Id.* at 58. Petitioner also pushed Victim to the floor, causing Victim to drop his cell phone. *Id.* at 59. Victim, bleeding heavily from the stabbing, attempted to grab his cell phone, but Petitioner kicked it away. *Id.* Petitioner, still holding the knife, said to Victim "give me the money, mother [expletive]." *Id.* at 59. Victim took approximately $130 in cash out of his pocket and tossed it on the floor. *Id.* at 60. Petitioner took Victim's cash and cell phone, and later drove away from the motel with Dames in his black two-door Chevrolet truck. *Id.*; Doc. [27-4] at 139–41.

Dames testified that hurting Victim was "never a part of the plan." *Id.* As Dames and Petitioner were leaving the motel property in Petitioner's truck, she asked him, "what the [expletive]?" *Id.* Dames also testified that Petitioner had a pocketknife in his hand and that he commanded her "[t]o shut up or he would slit [her] throat." *Id.* at 142. While driving through St. Ann, Petitioner tossed the knife out of the passenger side window. *Id.* at 143. Dames testified that she did not know the name of the street where Petitioner threw the knife. *Id.* Petitioner and Dames then went to Breckenridge Hills together and parked in a residential area near Foster Street and Royalton Avenue. *Id.* at 144. Petitioner told Dames to walk with him down Foster Street, where he eventually kicked Victim's cell phone into a sewer. *Id.* at 144, 149; Doc. [27-5] at 92, 94, 97–98. Petitioner walked with Dames to a nearby house, where he asked the occupant

---

[1] The motel room is split into a living room, bedroom, kitchen, and bathroom. Doc. [27-3] at 51.

if he could pay cash for something to clean himself. Doc. [27-4] at 148. The occupant brought Petitioner a towel, and Dames asked Edwards, Nolfo, and Dwyer to come pick her up. *Id.* at 153. When Edwards, Nolfo, and Dwyer showed up to get Dames, Petitioner told them to tell police that the robbery suspect was a "long-haired biker," who had hair down to the middle of his back. *Id.* at 154. Petitioner, who wore his hair at shoulder-length at the time, had Erryn Jenkins, his then-roommate, shave off all his hair the next day.[2] *Id.* at 155; Doc. [27-5] at 25–26.

Following the robbery and stabbing, Victim walked back to Domino's and passed out. Doc. [27-3] at 64, 67. Victim later underwent surgery. *Id.* at 73–74; Doc. [27-5] at 63–64. Victim's stab wound to the chest lacerated the right ventricle of his heart, penetrated his diaphragm, lacerated his liver and caused internal bleeding. Doc. [27-5] at 64–65. Victim would have bled to death if he had not received medical attention. *Id.* at 64.

On May 16, 2013, police first questioned Dames in an interrogation room at the Bridgeton Police Department. Doc. [27-4] at 161. Dames testified that, initially, she told police that she did not know about Petitioner's robbery plan and would not give them Petitioner's name because she was afraid that he might retaliate. *Id.* The next day, police went to Dames' mother's house and showed Dames several still-image photographs from a surveillance camera in the motel ("camera eleven") of her with Petitioner, Edwards, Dwyer, and Nolfo. *Id.* at 163. During this meeting with police, Dames identified everyone in the photographs, including Petitioner, and she told police that he "came to the hotel room to get high and that he had physically assaulted [Victim] and that [she] left with him after it was over." *Id.* at 165. Dames also admitted to police "[t]hat [she] brought [Victim] to the [motel] room knowing that he would be robbed," and that

---

[2] Jenkins testified that she was also shaving her and her daughter's hair off that day because they had met their fundraising goal for St. Baldrick's Foundation, a charity for children with cancer. Doc. [27-5] at 24. Jenkins also testified that Petitioner did not tell her why he wanted his head shaved. *Id.* at 34.

she and Petitioner agreed to equally split the money from the robbery. *Id.* at 166. Later, Dames also identified Petitioner from a lineup of "six different photos of different men [who] resembled [Petitioner]," by pointing to the image of Petitioner and told police where they could find Victim's cell phone.[3] *Id.* at 167. Detectives then went to Foster Street and Royalton Avenue, where they seized the cell phone, in pieces, from the sewer. Doc. [27-5] at 97–98. Before and during trial, Victim identified the cell phone as what Petitioner took from him in the motel room. Doc. [27-3] at 81.

Moreover, detectives showed Victim a still-image from camera eleven and, at trial, Victim testified that one of the men in the photograph looked like the person who stabbed and robbed him. *Id.* at 102–05. Nolfo, Dwyer, and Petitioner's wife viewed the same still-image at trial, and each identified Petitioner in the photograph. *Id.* at 176; Doc. [27-4] at 62; Doc. [27-6] at 27–28.

Prior to trial, detectives also showed Victim a line-up of men that Petitioner stood in, and Victim identified Petitioner in the line-up as the person who stabbed and robbed him. Doc. [27-3] at 83–84. Victim further testified that Petitioner's hair was longer when the incident occurred. *Id.* at 84.

## III.  Legal Standard

A prisoner in custody under the judgment and sentence of a state court may seek habeas relief on the grounds his custody violates the United States Constitution. *See* 28 U.S.C. §§ 2241(c)(3), (d). When considering a state prisoner's habeas petition, a federal court is bound by the Antiterrorism and Effective Death Penalty Act of 1996 ("the AEDPA"), to exercise "only

---

[3] During the times that police questioned Dames, she did not tell them about Petitioner throwing a knife out of his truck window, so police neither searched for the knife nor recovered it. Doc. [27-5] at 122. Following Petitioner's arrest, police eventually recovered a knife from his truck, but it had no connection to the stabbing. *Id.* at 169; Doc. [27-6] at 22–23.

limited and deferential review of underlying state court decisions." *Nash v. Russell*, 807 F.3d 892, 897 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Worthington v. Roper*, 631 F.3d 487, 495 (8th Cir. 2011)); *see* 28 U.S.C. § 2254(d). A federal court may not grant habeas relief to a state prisoner unless a state court's adjudication of the merits of a claim (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). If a state court's decision is not "contrary to" clearly established federal law, then the "unreasonableness" standard applies, which is "meant to be difficult to meet, and 'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" *Roper*, 695 F.3d at 831 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)).

A state court decision is an unreasonable application of clearly established federal law if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular . . . case." *Taylor*, 529 U.S. at 407–09. The test of reasonableness is an objective one. *Id.* at 409–10; *accord White v. Woodall*, 572 U.S. 415, 419 (2014).

The "clearly established Federal law" requirement of habeas review under Section 2254(d)(1) requires the habeas court to consider only United States Supreme Court precedent in force when a state court issues its decision. *Greene v. Fisher*, 565 U.S. 34, 38–40 (2011) (relying on *Cullen*, *supra*); *accord Taylor*, 529 U.S. at 412. State courts are not required to cite to

- 6 -

Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Revels v. Sanders*, 519 F.3d 734, 739 (8th Cir. 2008) (quoting *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Importantly, when reviewing a matter under Section 2254(d)(1), a federal habeas court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen*, 563 U.S. at 181–82.

The state court record is also significant when a federal habeas court analyzes under Section 2254(d)(2) whether a state court decision on the merits of a claim "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." A federal habeas court "accord[s] the state . . . court substantial deference" and does not supersede the state court's factual determination if "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (internal quotation marks and citation omitted). For purposes of Section 2254(d)(2), "a state-court factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010).

Importantly, "a determination of a factual issue made by a state court [is] presumed to be correct" unless the habeas petitioner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). The presumption of correctness applies to the factual determinations made by a state court at either the trial or appellate levels, *Smulls v. Roper*, 535 F.3d 853, 864–65 (8th Cir. 2008) (en banc), and to a state court's implicit findings of fact. *Grass v. Reitz*, 749 F.3d 738, 743 (8th Cir. 2014). Likewise, federal habeas courts defer to state court credibility determinations, *Smulls*, 535 F.3d at 864, and to "[a] state court's findings of fact made in the course of deciding" an ineffective-assistance-of-counsel claim. *Odem v. Hopkins*, 382 F.3d 846, 849 (8th Cir. 2004).

- 7 -

IV.    **Discussion**

A.   <u>**Grounds 1 through 3 Denied on the Merits**</u>

**Ground One: Petitioner claims that he was denied his right to due process, a speedy trial, and the right to compel under the Sixth and Fourteenth Amendments to the United States Constitution, in that the trial was continued at defense counsel's request over Petitioner's objection.**

A complaint was filed against Petitioner on May 17, 2013, and an arrest warrant was served on him the same day. Doc. [27-7] at 7. A grand jury indictment was filed on July 1, 2013, and a public defender ("Petitioner's counsel" or "counsel") entered his appearance for Petitioner and filed a request for discovery on Petitioner's behalf on July 10, 2013. *Id.* at 9. Petitioner's parole on another case was revoked, and he was delivered to the Missouri Department of Corrections on August 16, 2013. *Id.* at 38. It is undisputed Petitioner filed his first request for a speedy trial on October 25, 2013, and he continued to personally assert that request throughout the proceedings. *Id.* at 11.

Court dates were rescheduled from August 8, 2013, to November 1, 2013, but the record does not indicate who requested the rescheduling or why it was done. *Id.* On November 22, 2013, Petitioner's case was set for trial for March 31, 2014. *Id.* Then, on March 7, 2014, over Petitioner's objection, Petitioner's counsel filed a motion for a continuance, alleging he needed more time to prepare for trial. *Id.* at 11, 55–56. At the hearing, Petitioner's counsel told the trial court he could not adequately represent Petitioner if the case went to trial as scheduled because the discovery in the case was voluminous and additional investigation, including the taking of depositions, was necessary. Doc. [27-1] at 6. The prosecutor responded that she agreed with counsel's statements but told the court the State was not requesting a continuance. *Id.* at 7. The trial court found there was good cause to continue the trial, granted Petitioner's counsel's motion for a continuance, and reset the trial for September 15, 2014. *Id.* at 8.

On September 8, 2014, the trial court held a hearing on various motions filed by Petitioner's counsel, including a motion to inspect and test evidence and a motion for sanctions. *Id.* at 14, 18. Counsel's motion to inspect and test evidence related to granting Petitioner's counsel access to a knife found in the vehicle of one of the witnesses so it could be tested for DNA. *Id.* at 15. The prosecutor told the trial court she had requested the police to have the knife tested at a crime lab, but she did not have the results. *Id.* at 16–17. The trial court directed the crime lab to test the knife before the next scheduled hearing. *Id.* at 17.

Counsel's motion for sanctions alleged, (1) Petitioner's counsel had been unable to locate Victim at the address given to him by the prosecutor; (2) the prosecutor provided various items to the defense on September 4 and 5, 2014, including recordings of phone conversations that Petitioner had while in jail and a plea agreement between the State and Dames; and (3) Dames gave a recorded statement to law enforcement which had not been turned over to the defense. Doc. [27-7] at 88–94. Counsel's motion requested all the evidence listed in the motion be excluded from trial, or in the alternative, for the trial to be continued. *Id.* The prosecutor responded to each of the allegations, noting she had provided Victim's last known address and had told Petitioner's counsel she would make Victim available for a deposition. Doc. [27-1] at 20–21. In addition, the prosecutor told the trial court the State did not intend to use the recordings of Petitioner's phone conversations at trial, the State reached a plea agreement with Dames on September 4, Dames entered a guilty plea on the following day, and Dames' interview with the prosecutor's office was not recorded but a summary of the conversation was being prepared. *Id.* at 19–20, 23. Noting that Petitioner's counsel was in trial for the remainder of the week, the trial court ordered the State to make Victim available for a deposition to be conducted within the next ten days. *Id.* at 21. Petitioner's counsel indicated he wanted time to review the recordings and phone records turned over by the State to determine if they contained any

exculpatory information. *Id.* at 23. Petitioner's counsel also stated he wanted to depose Dames, and the trial court ordered the deposition to be set up immediately. *Id.* at 27. The trial court denied Petitioner's motion for sanctions based on its knowledge of what had taken place, noting discovery in the case had been ongoing and voluminous. *Id.* at 28. However, the trial court granted, over the State's objection and Petitioner's personal objection, Petitioner's counsel's request for a continuance and rescheduled the trial for October 27, 2014. *Id.* at 29.

On October 22 and 24, 2014, Petitioner's counsel filed numerous motions, including motions to suppress statements and physical evidence, a motion to dismiss all charges on the basis Petitioner's right to a speedy trial had been violated, and a motion for a continuance. Doc. [27-7] at 15–16. Counsel also filed Petitioner's "personal motion" to dismiss based on alleged speedy trial violations. *Id.* at 15. The trial court held a hearing on Petitioner's motions on October 27, 2014, the day trial was scheduled to begin. *Id.* at 17.

Petitioner's counsel explained at the hearing that his motions to dismiss and for a continuance were based on the potential unavailability of witnesses Carolyn and Jabbar Lindsey ("the Lindseys"). Doc. [27-1] at 121–22. According to Petitioner's counsel, the Lindseys were interviewed by police at the scene of the crimes and described the suspect as being in his early twenties, having short, blonde hair, and wearing a sky-blue shirt, characteristics which allegedly "differ[ed] materially from the physical appearance of [Petitioner]." Doc. [27-8] at 13–14. Petitioner's counsel also alleged the Lindseys had since moved out of state to an unknown location. *Id.* at 14. The trial court noted the Lindseys may have testimony material to the case and might be on a bus scheduled to arrive in St. Louis that afternoon. Doc. [27-1] at 120, 132. The trial court further stated it would continue the case to the following Monday, November 3, 2014, if the witnesses were not on the bus. *Id.* at 120. When the Lindseys were not on the bus and did not appear in court later that afternoon, the trial court granted Petitioner's counsel's

- 10 -

continuance request so counsel could attempt to locate and subpoena the witnesses. *Id.* at 151. The trial court reset the case for trial on November 3, 2014. Petitioner's counsel made a record that Petitioner personally opposed the continuance and asked the trial court to consider dismissing his charges. *Id.* at 135. The trial court denied the motions to dismiss and ordered the trial to begin on November 3, 2014, whether the Lindseys were present or not. *Id.* at 136, 172.

Petitioner's trial began on November 3, 2014. Doc. [27-2] at 3. At a pretrial conference, Petitioner's counsel renewed the motions to dismiss or for a continuance, informing the court he was unable to locate the Lindseys. *Id.* at 5. The prosecutor noted the Lindseys had not cooperated with the State, and Jabbar Lindsey had informed her he was living somewhere in Memphis, Tennessee and had no intention of coming back to Missouri unless the State paid for his transportation. *Id.* at 6–7. The prosecutor stated she sent paid bus tickets to the Lindseys, at an email address provided by Jabbar Lindsey, but she had not received any communication from the Lindseys since. *Id.* The prosecutor further noted the Lindseys had been uncooperative as far back as May of 2013 and their attitude had never changed. *Id.* at 8. The trial court denied Petitioner's counsel's motions to dismiss or for a continuance, and counsel supplemented the record with documents and a recording containing the Lindseys' description of the suspect to the police near the time of the incident. *Id.* at 8–10.

"The federal and Missouri constitutions provide equivalent protection for a defendant's right to a speedy trial." *State v. Sisco*, 458 S.W.3d 304, 313 (Mo. banc 2015). The Missouri Court of Appeals utilized the four-part test in *Barker v. Wingo*, 407 U.S. 514, 530–33 (1972), to determine whether Petitioner's speedy trial right had been violated. Because no bright-line test exists to determine a violation of this right, courts are required to consider four factors: (1) the length of the delay in bringing the defendant to trial; (2) the reasons for the delay; (3) the

defendant's assertion of his right to a speedy trial; and (4) any prejudice suffered by the defendant due to the delay. *Id.*

The first factor is a "triggering mechanism," and it is unnecessary to analyze the other three factors if the pretrial delay was short. *Id.* at 530. Here, the Missouri Court of Appeals found that the seventeen-month delay prior to Petitioner's trial was presumptively prejudicial and warranted review of the other factors. Doc. [27-13] at 25.

As for the second *Barker* factor, the reasons for the delays, the Missouri Court of Appeals determined there was some delay due to the State's performance of DNA analysis on a knife and because of the Lindseys' lack of cooperation. *Id.* at 26. The record also reflected that discovery was ongoing and voluminous. *Id.* However, the Missouri Court of Appeals found that "the reason for a substantial portion of the delay in [Petitioner's] trial was to provide counsel with more time to prepare for trial, which effectively protected [Petitioner's] right to effective assistance of counsel." *Id.* at 27. As such, it declined to weigh the second *Barker* factor heavily against the State. *Id.* at 26–27.

The third *Barker* factor is to look at how the defendant asserted his right to a speedy trial. Here, Petitioner asserted his right to a speedy trial only months after his arrest and did so repeatedly throughout the proceedings. Doc. [27-13] at 27–28. Accordingly, the Missouri Court of Appeals found this *Barker* factor weighed in Petitioner's favor. *Id.* at 28.

The last and most crucial factor of the *Barker* test is whether the defendant suffered any prejudice due to the delay in bringing him to trial. When reviewing this factor, courts analyze three sub-factors: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532. The Missouri Court of Appeals noted,

- 12 -

> In this case, [Petitioner's] sole allegations of prejudice are: [Petitioner's] parole on another case was revoked as a result of this indictment, and his trial in this case was continued, over his objection, to a date beyond his [Missouri Department of Corrections ("MDOC")] release date. In other words, instead of being able to go to trial on this case while he was incarcerated in MDOC, [Petitioner] had to wait until he completed his MDOC sentence before his trial in this case started. This resulted in oppressive pretrial incarceration lasting well over a year; [Petitioner] was returned to MDOC on August 16, 2013, and his trial did not begin until November [3], 2014. [Petitioner] also demonstrated prejudice by the loss of the testimony of Carolyn and Jabbar Lindsey, witnesses that even the trial court noted may have testimony material to the case. While the Lindseys were available and gave statements to the police near the time of the incident, they had moved out of state by the time of trial and became less willing to testify over time.

Doc. [27-13] at 28. The Missouri Court of Appeals noted that Petitioner's general claim of prejudice, based upon the length of his incarceration, established only minimal prejudice, and he did not allege any details about the conditions of his incarceration. *Id.* at 29. Moreover, the court found that Petitioner was sentenced to four terms of life imprisonment due to his convictions, so a pretrial delay lasting several months did not cause him to serve time he was not otherwise required to serve. *Id.*

As to the second consideration, the Missouri Court of Appeals found that Petitioner did not make any allegations that he suffered anxiety or concern because of the delay in his trial, nor did he cite any specific instances which weighed heavily upon him. *Id.*

With respect to the third consideration, whether Petitioner had demonstrated his defense had been impaired due to the delay in his trial, the Missouri Court of Appeals rejected his argument that the pretrial delay caused the Lindseys to become unavailable. Doc. [27-13] at 29–30. The record showed that the Lindseys refused to cooperate with police as early as May of 2013, when the crimes occurred. *Id.* In addition, the State offered to pay for the Lindseys transportation to testify at trial, but they still did not agree to appear, and Petitioner failed to offer

- 13 -

any evidence that the Lindseys would have further cooperated or testified at trial had the trial been held earlier than November 2014. *Id.*

In weighing the *Barker* factors, the Missouri Court of Appeals ultimately found that Petitioner: 1) had only shown minimal prejudice in relation to his pretrial incarceration, 2) failed to show he suffered actual prejudice as a result of pre-trial anxiety or concern, and 3) failed to meet his burden to prove actual prejudice as a possible impairment to his defense due to the delay in trial, including finding that Petitioner's claim that the Lindseys would have testified at his trial was merely speculative. *Id.* at 30. The Court finds that the Missouri Court of Appeals did not unreasonably apply the *Barker* factors in analyzing Petitioner's speedy trial claim, and its decision was neither contrary to clearly established federal law, nor based on an unreasonable determination of the facts. *See* § 2254(d)(1)–(2). Further, Petitioner did not rebut the presumed correct factual findings of the state court with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Therefore, Ground 1 is denied.

**Ground Two: Petitioner asserts that his due process rights were violated because the State failed to timely disclose additional video surveillance footage from the crime scene, which was not disclosed to the defense until the first day of trial.**

On July 10, 2013, Petitioner's counsel filed a request for discovery, pursuant to Missouri Supreme Court Rule 25.03(A), requesting, inter alia, "[a]ny material or information within the possession or control of the State or its agents which tends to negate the guilt of the defendant as charged or reduce punishment." *See* Rule 25.03(A)(9). Doc. [27-13] at 6. Prior to trial, the State disclosed to the defense video surveillance footage from camera eleven at the motel. It was the only surveillance footage which was given to the defense prior to trial. *Id.*

Testimony at trial revealed the police showed Dames multiple still-image photographs taken from camera eleven, and she identified herself, Petitioner, Edwards, Nolfo, and Dwyer as the individuals shown in the photographs. Doc. [27-4] at 163. In addition, Victim was shown a

- 14 -

still-image photograph taken from camera eleven, and he testified at trial that the man in the photograph looked like the man who stabbed and robbed him. Doc. [27-3] at 102–05. When shown the same still-image photograph at trial, Nolfo, Dwyer, and Petitioner's wife identified Petitioner as the man in the photograph. *Id.* at 176.

On the first day of trial testimony (Tuesday, November 4, 2014), the State called Bridgeton Police Detective Brice Loveall. Detective Loveall testified he reported to the motel on May 10, 2013, to meet with another officer who was reviewing the motel's video surveillance tapes. Doc. [27-3] at 114–15. After the other officer pointed out that video surveillance footage from camera eleven showed Victim and others on the motel stairwell, Detective Loveall had the motel staff download the footage from camera eleven onto a flash drive. *Id*. at 116. Detective Loveall identified State's Exhibit 26 as a copy of the footage that had been forwarded to the prosecutor's office, and the exhibit was admitted into evidence without objection. *Id.* at 117–18.

During cross-examination of Detective Loveall, Petitioner's counsel sought confirmation from the detective that footage from the surveillance camera in the motel lobby was not seized. *Id.* at 125. The detective testified that copies of surveillance footage from "all video cameras" were seized, placed on a DVD, and given to the prosecutor's office. *Id.* Petitioner's counsel then requested a bench conference and informed the trial court that Detective Loveall's testimony was unexpected, because the only video surveillance footage counsel had received was from camera eleven, which is an entrance. *Id.* The prosecutor stated she also had not received any footage from any other cameras. *Id.* She later told the trial court that every piece of evidence she had was turned over to Petitioner's counsel, and that she learned of the additional surveillance videos at the same time as Petitioner's counsel. *Id.* Upon further questioning by Petitioner's counsel, Detective Loveall testified he was not the person who provided any copies of video surveillance footage to the prosecutor, so he did not actually know if footage from cameras other than camera

- 15 -

eleven were turned over. *Id.* at 126. The detective also testified that all video surveillance footage was on file with the other evidence in the case on the law enforcement server. *Id.*

The trial court subsequently ordered Petitioner's counsel to be provided with the DVD containing the undisclosed surveillance footage before 5:00 p.m. that day. *Id.* at 128–29. The trial court asked Petitioner's counsel if an overnight review of the footage would be sufficient, and counsel stated it would be so long as Detective Loveall would be available for recall. *Id.* at 128. The trial court stated the detective would be available for recall. *Id.* at 128–29.

When court reconvened the following morning (Wednesday, November 5, 2014), the trial court made a record that the DVD with the previously undisclosed surveillance footage had been turned over to defense counsel and the prosecutor. Doc. [27-4] at 4. Petitioner's counsel informed the trial court that a large portion of the footage had been reviewed the previous night, and investigators and interns at the Public Defender's office would continue to view the footage while the trial proceeded. *Id.* Petitioner's counsel also told the trial court that all the footage would be viewed by the end of the day, and the State's case was expected to continue for the next one to two days. *Id.*

When court reconvened the next morning (Thursday, November 6, 2014), Petitioner's counsel made a record that the motel had three video banks of cameras, with each bank containing up to sixteen different cameras. Doc. [27-5] at 46. Camera number nine ("camera nine") and camera number ten ("camera ten") looked out from the lobby onto the parking lot towards Lindbergh boulevard and the exit from the parking lot onto Lindbergh boulevard. Footage from those cameras showed a black Chevrolet truck drive onto the parking lot at 10:09:39 p.m. *Id.* Then, the same truck exits the parking lot onto Lindbergh boulevard at 10:09:45. *Id.* at 47. Camera 11 (the stairwell) captured still shots of Victim as he entered the motel for the first time at 10:09:54 p.m. *Id.* Cameral 11 also showed a man identified by

- 16 -

witnesses as Petitioner leaving the motel at 10:16:06 p.m., and Dames leaving the motel with a

pizza in her hand at 10:16:12 p.m. *Id.* Petitioner's counsel argued that the time stamps on camera

9 in the parking lot showed Petitioner's truck leaving the motel before the Victim even arrived at

the motel and before Dames left with the pizza and the suspect left the motel. *Id.* at 47–48.

Petitioner's counsel also informed the trial court that he had received an email from the

prosecutor at 6:45 p.m. the previous evening (Wednesday, November 5, 2014) indicating another

Bridgeton police detective, William Dickherber, had gone to the motel earlier that same day and

taken "screen shots" of two video banks – one containing camera nine and camera ten and one

containing camera eleven. *Id.* at 48. The email further indicated Detective Dickherber had

discovered a time discrepancy between the two video banks of six minutes and twenty-three

seconds. *Id.* at 48–49.

The trial court made a record of the discussion it had with Petitioner's counsel and the

State regarding the cameras, the time discrepancies, testimony of other witnesses, the fact that

the police did not check for any syncing discrepancies in terms of time stamping between the two

video banks on May 10, 2013 (when the video was seized), and whether the evidence affected

Petitioner's trial strategy. *Id.* Petitioner's counsel argued that this potentially exculpatory video

surveillance footage from cameras nine and ten should have been disclosed to the defense during

the normal discovery process, and that the State's failure to disclose the evidence constituted a

violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Doc. [27-5] at 49.

The Missouri Court of Appeals summarized the trial court's decision to deny Petitioner's

motion for mistrial and subsequent motion for continuance as follows:

> The court questioned the impact of the "time" issue on [Petitioner's] case and
> noted that if [Petitioner's] defense was misidentification, then presenting evidence
> of his truck leaving the motel parking lot would be damaging evidence indicating
> he was at the scene of the charged crimes. In response, [Petitioner's counsel]
> argued [Petitioner] made a statement to the police that he loaned his truck to

- 17 -

someone on the night of the incident, so the presence of the truck did not damage his defense that he did not commit the crime. The court noted [Petitioner's] statement to the police had been previously suppressed[4] and denied the motion for a mistrial. [Petitioner's] counsel subsequently moved for a continuance of the trial so he could investigate whether time discrepancies in the videos existed on the day of the charged crimes. The trial court denied the motion.

Doc. [27-13] at 9.

Subsequently, Detective Dickherber testified for the State, and described information obtained during his review of the video cameras at the motel. Detective Dickherber testified that the motel had four different servers for its surveillance camera system, and camera eleven was on a different server than cameras nine and ten. Doc. [27-5] at 125. The detective also testified he compared the time stamp on the servers to the time reflected on his own watch. *Id.* at 128. Detective Dickherber stated that while the time stamp on the server for camera eleven matched his watch and appeared to be accurate, the time stamp on the server for cameras nine and ten was six minutes and twenty-three seconds slower than the time stamp on the server for camera eleven. *Id.* at 130.

During cross-examination of Detective Dickherber, Petitioner's counsel played a portion of the video surveillance footage captured by cameras nine and ten and offered into evidence still photographs taken from the footage. *Id.* at 177–78. Petitioner's counsel elicited testimony from Detective Dickherber that the time stamp on cameras nine and ten showed a truck appearing to match Petitioner's leaving the motel parking lot at 10:09:39 p.m., while camera eleven showed the Victim entering the motel at 10:09:54 p.m. *Id.* at 179–81. Detective Dickherber testified that even factoring in the alleged six minute and twenty-three second discrepancy, the time stamp on cameras nine and ten showed the truck leaving the motel parking lot at 10:16:02 p.m., while the

---

[4] Prior to trial, Petitioner's counsel filed a motion to suppress Petitioner's statement to the police on the grounds it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and the trial court granted the motion. Doc. [27-13] at 9.

- 18 -

time stamp on camera eleven showed the man identified as Petitioner present in the motel stairwell at 10:16:06 p.m. *Id.* at 186–89. Detective Dickherber conceded that, by his own investigation into the cameras and even compensating for the alleged time discrepancy, the truck appearing to match Petitioner's was leaving the motel parking lot while the man identified as Petitioner was still in the motel stairwell. *Id.* at 189.

During closing argument, Petitioner's counsel argued about the video evidence and Detective Dickherber's testimony to the jury:

> If you add up the times, even giving [Detective Dickherber] the benefit of the doubt that these camera banks are not in sync[,] . . . if you add the time discrepancy, which is 6:23, you get [10:]16:02, and you can take your time to work the math. That truck is in motion [while the suspect] is walking out, and [the detective] knows he has a problem . . . and evidence is not coming together the way he wants it. I know yesterday I was cross with Detective Dickherber, but these are very serious matters, and . . . in this case . . . we're not talking about reasonable doubt. [Petitioner] was not there in that room when [Victim] was stabbed and robbed.

Doc. [27-6] at 101–02.

The Missouri Court of Appeals found that the State did not dispute that, (1) Defendant made a timely written request for discovery pursuant to Rule 25.03(A)(9); (2) the video surveillance footage from all of the cameras at the motel should have been disclosed to the defense prior to trial; (3) the footage from cameras nine and ten contained evidence favorable to Defendant; and (4) the evidence was inadvertently suppressed by the State. Instead, it focused on Petitioner's arguments that his case was similar to *Buchli v. State*, 242 S.W.3d 449 (Mo. Ct. App. 2007), the late disclosure of the evidence affected his trial strategy, and that denial of his motion for continuance affected his ability to prepare a defense to the late-disclosed video surveillance footage. The State argued that Petitioner was not entitled to relief because he could not show the State's failure to make a timely disclosure of the evidence resulted in fundamental unfairness or was material pursuant to *Brady*.

- 19 -

*United States v. Gonzales* summarized the application and limitations of *Brady*:

Under *Brady*, *supra*, the government is required to disclose any evidence that is both "favorable to an accused" and is "material either to guilt or to punishment." In most circumstances, evidence favorable to the accused is material only "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" The defendant must demonstrate that he was denied a fair trial, by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Brady* applies whether or not the accused has specifically requested the covered information . . . and it applies to both exculpatory evidence and impeachment evidence. In analyzing a *Brady* claim, we do not consider the suppressed evidence item-by-item, but rather we must determine whether the suppressed evidence, viewed collectively, undermines confidence in the verdict.

There are several limitations to *Brady*. First, *Brady* does not require the government to disclose inculpatory evidence. Second, in this Circuit, the rule of *Brady* is limited only to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense. Where the prosecution delays disclosure of evidence, but the evidence is nonetheless disclosed during trial, *Brady* is not violated.

*United States v. Gonzales*, 90 F.3d 1363, 1368 (8th Cir. 1996) (citations omitted).

The Missouri Court of Appeals found that Petitioner had not demonstrated that the late-disclosed video surveillance footage prevented meaningful efforts to consider and prepare a strategy for addressing the evidence where, "(1) counsel's staff reviewed all of the evidence before the State's presentation of the evidence was complete; (2) counsel was able to utilize the evidence in cross-examining Detective Dickherber and gain admissions that were favorable to Defendant's case; and (3) counsel was able to highlight those admissions in closing argument." Doc. [27-13] at 13–14.

Upon discovery of the video surveillance tapes issue, the trial court stopped the trial and ordered the footage from all video surveillance cameras be given to Petitioner's counsel for review. When court reconvened the following morning, Petitioner's counsel informed the trial court that footage had been reviewed the previous night, and investigators and interns at the Public Defender's office would continue to view the footage during the State's case. The State

- 20 -

presented testimony from Detective Dickherber to explain to the jury the motel's video surveillance system and the various cameras and footage provided from those cameras. Detective Dickherber testified as to the discrepancy in the time stamps on the cameras, and Petitioner's counsel was able to cross-examine him and gain an admission that even when the alleged discrepancy was figured in, the cameras still showed the truck leaving the motel parking lot while the man identified as Petitioner was still in the motel stairwell. Petitioner's counsel was also able to put before the jury the fact that the time stamps on cameras nine and ten, had they been accurate, showed the truck leaving the parking lot before the Victim entered the motel, as reflected by the time stamp on camera eleven. As such, Petitioner was able to utilize the exculpatory evidence in front of the jury. Further, Petitioner's counsel was able to use Detective Dickherber's testimony in closing argument. Specifically, Petitioner's counsel was able to argue to the jury that even if they gave the detective the benefit of the doubt and believed his testimony that the cameras were not in sync and contained a time discrepancy, the discrepancy showed the truck leaving the motel parking lot, while the suspect was still in the motel stairwell, demonstrating that Petitioner was not in the motel room when Victim was stabbed and robbed.

Ultimately, the Missouri Court of Appeals held that Petitioner did not demonstrate that the video surveillance footage from cameras nine and ten was material pursuant to *Brady* or resulted in fundamental unfairness because it affected Petitioner's trial strategy. Doc. [27-13] at 19. The court found that even if the late-disclosed video surveillance footage from cameras nine and ten had been disclosed earlier, it would not have provided Petitioner with a plausible and persuasive theory of innocence or that it would have put the case in such a different light that it undermined confidence in the verdict. *Id.* at 18. "In other words, [Petitioner] has not convinced this Court there is a connection between the late-disclosed video surveillance evidence and a

theory that [Petitioner] loaned out his truck on the night of the charged crimes." *Id.*[5]

The Court finds that the Missouri Court of Appeals did not unreasonably apply *Brady* in analyzing Petitioner's claim, and its decision was neither contrary to clearly established federal law, nor based on an unreasonable determination of the facts. *See* § 2254(d)(1)–(2). Further, Petitioner did not rebut the presumed correct factual findings of the state court with clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). Therefore, Ground 2 is denied.

**Ground Three: Petitioner claims that he had ineffective trial counsel, in that trial counsel failed to introduce records of Petitioner's negative drug test and requested continuances over his objection. Petitioner additionally argues that he had ineffective appellate counsel, in that it failed to raise a claim under the Uniform Mandatory Disposition of Detainers Law ("UMDDL") and regarding the speedy-trial claim counsel raised on direct appeal.**

To bring a claim for ineffective assistance of counsel under *Strickland*, Petitioner must demonstrate that 1) trial counsel's performance was so deficient as to not function as "counsel" guaranteed by the Sixth Amendment, and 2) Petitioner was prejudiced by this deficiency. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Counsel's judgment is measured against a highly deferential, objective standard of reasonableness. *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005). This strict standard provides "a strong presumption that the counsel's conduct falls within the wide range of reasonable professional judgment." *Strickland*, 466 U.S. at 689. Petitioner must overcome a strong presumption that counsel has rendered constitutionally effective assistance. *Id.* at 690. Counsel's strategic choices made after thorough investigation are virtually unchallengeable, and decisions following less thorough, but nevertheless reasonable, investigation are to be upheld to the extent that they are supported by reasonable judgment. *Id*. Under the prejudice prong of *Strickland*, Petitioner must show that, "but for counsel's deficiency

---

[5] The Missouri Court of Appeals also found that Dames, Nolfo, Dwyer, and Victim provided overwhelming testimony, independent of any testimony identifying Defendant as the man in the surveillance footage from camera eleven, which placed Defendant in the motel room near or at the time the crimes against Victim occurred and implicated Defendant as the person who stabbed and robbed Victim. Doc. [27-13] at 17.

there was a 'reasonable probability that . . . the result of the proceeding would have been different.'" *Lamar v. Graves*, 326 F.3d 983, 985 (8th Cir. 2003) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

A petitioner's "[f]ailure to establish either *Strickland* prong is fatal to an ineffective-assistance claim." *Worthington v. Toper*, 631 F.3d 487, 498 (8th Cir. 2011). A court need not address both prongs of the *Strickland* test if it finds the habeas petitioner has not established one of the prongs. *Strickland*, 466 U.S. at 697.

In the first argument of Ground 3, Petitioner alleges that his trial counsel was ineffective for failing to endorse witnesses and present evidence necessary to admit a negative drug test that Petitioner took three days after the charged crimes were committed. Doc. [1] at 9. During post-conviction proceedings, Petitioner claimed that three days following the events of the charged crimes, a drug screening he did for his job produced a negative result. Doc. [27-15] at 72. Petitioner asserted that this evidence could have refuted the State's theory that Petitioner committed the crime following a "methamphetamine binge." *Id.*

At the post-conviction evidentiary hearing, David Borgmeyer, one of Petitioner's counsel at trial,[6] testified that Petitioner informed counsel of the negative drug screen and counsel obtained a copy. Doc. [27-14] at 18–19. During discovery, the State disclosed a report containing information from Petitioner's former cellmate, Donald Bartsma. *Id.* at 19. Borgmeyer testified that the State's report claimed that Petitioner told Bartsma that he manipulated the drug test to come back negative even though he had recently taken drugs. *Id.* Borgmeyer additionally testified that if the State had impeached the drug test results with

---

[6] Weeks before trial, Steven Reynolds, the district defender for the public defender entered his appearance to also represent Petitioner.

Bartsma's testimony, the only witness the defense could have called to impeach Bartsma would be Petitioner. *Id.* at 20. Borgmeyer did not want Petitioner to testify because he did not want the jury to know that Petitioner had been incarcerated for another crime. *Id.* Due to the risks, Borgmeyer strategically chose not to present the drug-test evidence at trial.[7] *Id.*

After review of the post-conviction evidentiary hearing and record, the Missouri Court of Appeals found that the motion court's findings of fact and conclusions of law were not clearly erroneous in finding that trial counsel reasonably chose not to introduce the drug test evidence as a matter of trial strategy, and that because Petitioner failed to prove the first prong of *Strickland*, it did not need to address the prejudice prong. Doc. [27-18] at 4–6.

The Court finds that the Missouri Court of Appeals' application of *Strickland* was not unreasonable, and that Petitioner did not rebut the presumption of correctness by clear and convincing evidence as to the factual determinations made by the state court regarding the drug test.

In Ground 3, Petitioner additionally argues that trial counsel Borgmeyer's conduct and requests for continuances demonstrated a conflict of interest in his representation of Petitioner. Doc. [27-16] at 24. Borgmeyer testified at Petitioner's post-conviction evidentiary hearing that he met with Petitioner several times while representing him and did not believe that they had a contentious relationship. Doc. [27-18] at 9. Borgmeyer testified that Petitioner "tend[ed] to get upset" and was "excitable," but he was not sure if Petitioner's emotions were aimed at him or toward Petitioner's circumstances in general. *Id.* at 9–10. And while Borgmeyer was aware that Petitioner objected to the continuances, he did so to more adequately prepare for trial and

---

[7] During trial, Reynolds stated that he intended to introduce the negative drug test as a business record, but the State objected that that notice was untimely, the proper foundation had not been laid to introduce the report as a business record, and the report contained hearsay. Doc. [27-6] at 49–51. The trial court sustained the State's objection.

informed the trial court of Petitioner's objections. *Id.* Borgmeyer further testified that he represented Petitioner as he would any other client and did not do anything differently in Petitioner's case than he has in any other case. *Id.* Approximately 30 to 45 days before trial, Borgmeyer was replaced as lead counsel because Petitioner had called his supervisors and threatened to cause him physical harm if he showed up in court. *Id.* Thereafter, Borgmeyer served as second chair at trial. *Id.* Later, during his testimony at the evidentiary hearing, Reynolds confirmed that he entered the case a month to six weeks before trial because, after an investigation, he determined that Petitioner had made "credible" threats against Borgmeyer. *Id.* Reynolds testified that he served as first chair "so that [Borgmeyer] would not be in physical harm." *Id.* Petitioner testified by deposition:

> [Petitioner] contacted Borgmeyer's supervisors and left voice mails expressing displeasure with [Borgmeyer] after learning that some witnesses [Petitioner] wanted to be called at trial had moved out of state. [Petitioner] testified that Borgmeyer's supervisors followed up and within two or three days, Reynolds visited him in jail. [Petitioner] further stated that Borgmeyer came to see him about three times, including one time where he asked [Petitioner] to waive his rights under the UMDDL. [Petitioner] stated that Borgmeyer never told him he needed a continuance because he was waiting on additional evidence from the State that could potentially help his case.

Doc. [27-18] at 10.

"A criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991) (citations omitted). Further, Petitioner had to show that counsel's alleged conflict of interest actually adversely affected counsel's performance. *Mickens v. Taylor*, 535 U.S. 162, 165 (2002).

After review of the post-conviction evidentiary hearing and record, the Missouri Court of Appeals found that the motion court's findings of fact and conclusions of law were not clearly

erroneous in determining that Petitioner "fail[ed] to state what was done by Mr. Borgmeyer that was advantageous to another, or what Mr. Borgmeyer failed to do that was detrimental to the Petitioner. Petitioner state[d] only that 'irreconcilable differences' resulted in 'prejudicial delays.'" Doc. [27-15] at 131. Petitioner failed to meet his burden of overcoming the strong presumption that trial counsel's actions were a matter of trial strategy. Petitioner did not provide any facts that suggest counsel had an actual conflict of interest that divided his loyalties at trial and failed to show an irreconcilable conflict that caused a breakdown in communication. Petitioner's deposition testimony during post-conviction proceedings shows that his issues with counsel arose from their disagreement "over the continuance and counsel's ability to locate his witnesses." Doc. [27-18] at 11. The Missouri Court of Appeals found that these allegations were insufficient to show a conflict of interest as a matter of law because Petitioner's Sixth Amendment rights were "not violated by general dissatisfaction or disagreements over strategy." *United States v. Jones*, 662 F.3d 1018, 1025–26 (8th Cir. 2011). Further, Borgmeyer testified that he filed a motion for a continuance over Petitioner's objection because the case was not ready for trial, as evidence that had been obtained over a period of months needed to be examined and tested. Doc. [27-18] at 8; Doc. [27-14] at 9, 21–22. The Court finds that the Missouri Court of Appeals did not unreasonably apply *Strickland*, and Petitioner did not rebut the presumption of correctness by clear and convincing evidence as to the factual determinations made by the state court regarding the alleged conflict of interest with trial counsel.

Petitioner further claims in Ground 3 that direct appeal counsel, Margaret Johnston, was ineffective for not raising his UMDDL claim. In claims that appellate counsel was ineffective, petitioners must show that counsel unreasonably failed to discover non-frivolous issues and file a merits brief raising them, and a reasonable probability that but for his counsel's unreasonable failure to file a merits brief, the claim would have prevailed on appeal. *Smith v. Robbins*, 528

U.S. 259, 285–86 (2000) (citing *Strickland*, 466 U.S. 668). Appellate counsel need not, and should not, raise every non-frivolous claim in a merits brief. *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Rather, appellate counsel should select from among potential issues to maximize the likelihood of success on appeal. *Id.* "Generally, only when ignored issues are clearly stronger than those presented will the presumption of effective assistance be overcome." *Id.* (citations omitted). It should be noted that Petitioner's motion for new trial contained 26 claims of error. Doc. [27-9] at 8.

Trial counsel Borgmeyer testified at Petitioner's post-conviction evidentiary hearing that he spoke with Petitioner about the UMDDL motion that Petitioner had filed. Doc. [27-18] at 10; Doc. [27-14] at 7. Prior to trial, trial counsel's motion to dismiss for speedy trial issues and Petitioner's *pro se* motion for speedy trial violations, which referenced the UMDDL, were denied. Doc. [27-18] at 8. Through affidavit, appellate counsel Johnston testified that Petitioner had adamantly stated he wanted her to include a claim that his rights under the UMDDL had been violated. Doc. [27-18] at 8; Doc. [27-15] at 90. Johnston admitted that her failure to cite to the UMDDL in Petitioner's direct appeal appellate brief was an erroneous omission. She added, however, that Petitioner was not prejudiced by her omission because the Missouri Court of Appeals found on direct appeal that there was no violation of Petitioner's right to a speedy trial, which is a prerequisite to finding a violation of the UMDDL.[8] Doc. [27-18] at 8; Doc. [27-15] at 90–91. Ultimately, the Missouri Court of Appeals determined:

> Given this record, the motion court did not clearly err in finding [Petitioner] was not entitled to relief as he failed to establish prejudice by trial counsel's obtaining a continuance or by appellate counsel's failure to include the UMDDL in her

---

[8] Under Missouri law, the trial court could not find a violation of the UMDDL unless there was a constitutional speedy trial violation. Mo. Rev. Stat. § 217.460 (2009). Missouri's UMDDL provision allows the trial court to dismiss an indictment where the defendant is not brought to trial within 180 days *and* the court finds the defendant's constitutional right to a speedy trial was violated. *Id.*

brief. Because [Petitioner] did not suffer a constitutional speedy trial violation, as this Court determined on direct appeal, he was not entitled to dismissal of the charges under the UMDDL.

Doc. [27-18] at 8.

The Court finds that the Missouri Court of Appeals did not unreasonably apply *Strickland* or any other federal laws in finding that "because this [c]ourt determined on direct appeal there was no violation of [Petitioner's] constitutional right to a speedy trial, there could be no prejudice to [Petitioner] from the failure of either trial or appellate counsel to cite to the UMDDL." *Id.* at 7. Petitioner has failed to show there is a reasonable probability that, but for appellate counsel's failure to include an argument in the merits brief regarding UMDDL, the claim would have prevailed on appeal. Further, the Missouri Court of Appeals opinion was not based on an unreasonable determination of the facts and Petitioner did not rebut the presumed correct factual findings of the state court with clear and convincing evidence. *See* 28 U.S.C. §§ 2254(e)(1), 2254(d)(1)–(2). Therefore, Ground 3 is denied.

### B.  Grounds 4 through 8 Are Procedurally Barred

A federal court may only grant habeas relief to a state prisoner who has exhausted available state remedies. *See* 28 U.S.C. § 2254(b)(1)(A). A prisoner satisfies the exhaustion requirement by properly pursuing a claim throughout the entire appellate process of the state. *Wayne v. Mo. Bd. of Prob. & Parole*, 83 F.3d 994, 998 (8th Cir. 1996). A procedural default occurs when a prisoner violates a state procedural rule and this violation serves as an independent and adequate state-law basis to uphold the state courts' dismissal of a claim, thereby precluding consideration of federal claims on direct appeal. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). However, a state prisoner who defaults on his federal claims in state court because of a state procedural rule can overcome the procedural bar and obtain federal habeas review on the merits by demonstrating either: 1) cause for the procedural default and actual

- 28 -

prejudice resulting from the alleged violation of federal law, or 2) that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Coleman*, 501 U.S. at 750; *Murray v. Carrier*, 477 U.S. 478, 495–496 (1986).

In Ground 4, Petitioner argues that the *trial court* failed to acknowledge Petitioner's pro se motions for speedy trial and alleges a conflict of interest with counsel.[9] Petitioner did not raise these claims on direct appeal. In Ground 5, Petitioner argues that his pre-trial witness lineup was improperly suggestive because he was forced to stand in position 1, he was the only person in the lineup with tattoos, a police officer whispered instructions to the witness, and he did not have an attorney present for the lineup. Petitioner appears to argue that direct appeal appellate counsel was ineffective for not raising this claim on direct appeal. Although this ineffective assistance of appellate counsel claim was included in Petitioner's Missouri Supreme Court Rule 29.15 amended motion, it was not included in the post-conviction appeal. In Ground 6, Petitioner alleges that Detective Dickherber committed perjury during a pre-trial suppression hearing because Detective Dickherber testified that Petitioner waived his *Miranda* rights, but the trial court later suppressed Petitioner's statement. Petitioner did not raise a claim about Detective Dickherber's alleged false statements during the pre-trial suppression hearing, at trial, or in his direct appeal. In Ground 7, Petitioner alleges that the *trial court* erred in failing to declare a mistrial when State's witness James Dwyer testified that Petitioner had bragged about being in prison. Petitioner's counsel did object to Dwyer's testimony in this regard and requested a mistrial, however, Petitioner did not raise this claim on direct appeal. And, in Ground 8, Petitioner alleges that unnecessary delays in trial caused four witnesses to become unavailable.

---

[9] Petitioner has raised other claims that address his right to speedy trial (Ground 1) and his alleged conflict of interest with counsel (Ground 3), but Petitioner failed to raise a claim that specifically cited the *trial court's* failure to acknowledge his *pro se* motions.

Because Petitioner has failed to show cause and actual prejudice or actual innocence in his conclusory statements and threadbare arguments, Petitioner's Grounds 4 through 8 are procedurally barred. However, in an abundance of caution, the Court briefly turns to each ground on the merits.

**Ground 4: Petitioner contends that the *trial court* refused to acknowledge his *pro se* motions regarding speedy trial issues and alleges "breakdown of attorney-client relationship" and conflict of interest with counsel.**

Petitioner contends that the *trial court* refused to acknowledge his *pro se* motions regarding speedy trial issues and an alleged "breakdown of attorney-client relationship" as well as a conflict of interest with counsel. Doc. [1] at 10. Petitioner did not raise these claims on direct appeal. Doc. [27-10]. Petitioner raises other claims that address his right to a speedy trial in Ground 1 and alleges a conflict of interest with counsel in a portion of Ground 3 discussed *infra*. However, Petitioner did not raise a claim that specifically cites the *trial court's* failure to acknowledge his *pro se* motions.[10] Doc. [27-10]. Instead, Petitioner merely explains in Ground 4 of his petition that this was not raised on direct appeal because direct appeal appellate counsel, Margaret Johnston, "refused to raise it." Doc. [1] at 10. Further, as discussed *infra* in Ground 2 and Ground 3, Petitioner's speedy trial rights were not violated, there was no conflict of interest with trial counsel, and Petitioner was not prejudiced by appellate counsel not setting forth an argument concerning UMMDL in Petitioner's direct appeal. Petitioner has failed to show cause and actual prejudice, or actual innocence. As such, Ground 4 is denied.

**Ground 5: Petitioner claims he did not have an attorney present during his pre-trial witness lineup, he was forced to stand in position one, he was the only person with tattoos in the lineup, and that a detective whispered instructions to Victim.**

---

[10] Furthermore, the record in this matter shows numerous interactions between Petitioner, his counsel, and the trial court addressing *pro se* motions filed by Petitioner. *See, e.g.*, Doc. [27-1] at 84–85, 136.

In Ground 5, Petitioner states that he did not have an attorney present during his pre-trial witness lineup, he was forced to stand in position one, he was the only person with tattoos in the lineup, and a detective whispered instructions to Victim. Doc. [1-1] at 1. The entirety of Petitioner's Ground 5 is that "he cannot get cooperation from Public Defenders," alleging that his direct appeal appellate counsel, Margaret Johnston, "said it would be best to bring it up now in 2254," and that he believed that he had raised this issue "when he mailed his 29.15 to the court [of appeals]." Doc. [1] at 11–14; Doc. [1-1] at 1. *Id.* Petitioner appears to suggest that his pre-trial witness lineup was improperly suggestive,[11] and that appellate counsel was ineffective for failing to raise the issue on direct appeal.

Trial counsel Borgmeyer filed a motion to suppress identification in the trial court because he was not present during Petitioner's lineup. Doc. [27-7] at 86. The lineup video was admitted into evidence at the suppression hearing. Doc. [27-1] at 59. The motion to suppress was denied after the hearing, renewed at trial, and denied. Doc. [27-3] at 61; Doc. [27-8] at 7. No further argument was made regarding this issue in Petitioner's motion for new trial or set forth on direct appeal as plain error. Post-conviction counsel set forth an ineffective assistance of appellate counsel claim in Petitioner's amended motion under Missouri Supreme Court Rule 29.15 for failing to raise the issue on direct appeal. Doc. [27-15] at 53. In the post-conviction motion court's findings of fact and conclusions of law pursuant to Missouri Supreme Court Rule

---

[11] First, Petitioner has presented no evidence to show that his tattoos were still visible or suggestive. Second, Petitioner has provided no evidence that the police whispered any suggestions to the victim. Detective Welby testified that the investigators did not point to anyone in the lineup or give any suggestions to the victim in any way and that the trial court was able to review the video of the lineup. Third, Petitioner's complaint about his position in the lineup provides no support for the idea that the defendant's position in the lineup, by itself, is evidence of suggestive identification procedures. Detective Welby testified that the investigators did not know what position Petitioner would be in because that was decided by the jail watch commander who did not take part in the investigation. Petitioner has provided no evidence to show that the procedures at his lineup were impermissibly suggestive. If this ground were even reviewed on the merits, Petitioner has failed to show cause and actual prejudice or actual innocence in his conclusory statements and threadbare arguments.

29.15 it found:

> In the fourth point, Point 9(d), Movant claims he was denied effective assistance
> of appellate counsel because his appellate counsel did not argue his rights were
> violated when he was placed in a line-up after being charged in violation of his
> constitutional rights. The accused is not entitled to counsel "until the initiation of
> adversarial proceedings." *State v. Motley*, 740 S.W.2d 313, 318 (Mo. App. E.D.
> 1987). The lineup in this cause was conducted on May 13, 2013. (Bridgeton
> Police Department Report 13-1544, page 44). [Petitioner] was not charged until
> May 17, 2013. The line-up was conducted prior to any adversarial proceedings.
> Therefore, [Petitioner] was not entitled to counsel.

Doc. [27-15] at 132. This ineffective assistance of appellate counsel claim was not included in
the post-conviction appeal and is procedurally defaulted.

"There is no right to effective assistance of counsel under the Sixth and Fourteenth
Amendments to the U.S. Constitution in collateral, post-conviction, state-court proceedings, and
as such, the failures or infirmities of counsel at this stage generally are not attributable to the
state." *Wooten v. Norris*, 578 F.3d 767, 778 (8th Cir. 2009) (quoting *Coleman*, 501 U.S. at 750).
A narrow exception has since been created in *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) where:
"(1) the claim of ineffective assistance of trial counsel was a 'substantial' claim; (2) the 'cause'
consisted of there being 'no counsel' or only 'ineffective' counsel during the state collateral
review proceeding; and (3) the state collateral review proceeding was the 'initial' review
proceeding with respect to the 'ineffective-assistance-of-trial-counsel claim.'" *Kemp v. Kelley*,
924 F.3d 489, 499 (8th Cir. 2019) (quoting *Dansby v. Hobbs*, 766 F.3d 809, 834 (8th Cir. 2014));
*see Martinez*, 566 U.S. at 14.

As stated previously, Petitioner did not preserve the improper pretrial lineup motion in
his motion for new trial, and it was not included on direct appeal as a claim of plain error.
However, post-conviction counsel set forth an ineffective assistance of appellate counsel claim in
Petitioner's amended Rule 29.15 motion for failing to raise the issue on direct appeal. The post-
conviction motion court addressed the issue, finding that the lineup occurred prior to adversarial

- 32 -

proceedings and that Petitioner was not entitled to counsel. *See Kirby v. Illinois*, 406 U.S. 682, 688–89 (1972) (A person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against a defendant – "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."). Therefore, an accused is entitled to counsel at a post indictment or post information line-up identification, but not at a line-up that occurs *before* a defendant has been formally charged. As such, Petitioner is unable to show how this claim of ineffective assistance of trial counsel was substantial under the *Martinez* exception. 566 U.S. 1. Ground 5 is denied.

**Ground 6: Petitioner alleges Detective Ryan Dickherber committed perjury on October 27, 2014, by testifying that Petitioner waived his *Miranda* rights, and that the trial judge altered the public record and did not hold Detective Dickherber accountable for perjury.**

In Ground 6, Petitioner alleges that Detective Dickherber committed perjury when he testified that Petitioner waived his *Miranda* rights at the October 27, 2014, hearing on Petitioner's motion to suppress statements and motion to suppress physical evidence. Doc. [27-1] at 86. Petitioner did not raise this claim about Detective Dickherber's alleged false statements during the pre-trial suppression hearing, at trial, or in his direct appeal. Detective Dickherber testified that once Petitioner was taken into custody, he was brought to the police station and Detective Dickherber conducted a video-recorded interview with him. Doc. [27-1] at 95. Detective Dickherber testified at the hearing that, he read Petitioner his *Miranda* rights, Petitioner understood his rights, and Petitioner agreed to waive those rights. *Id.* Detective Dickherber further testified at the hearing that Petitioner made a few statements during the booking process which were not recorded. *Id.* at 97. On cross-examination during the hearing Detective Dickherber was asked about the use of *Miranda* forms. Detective Dickherber testified that "he may not have" had one of the forms in the interview room, but that "I believe he was shown the form. We just didn't have it signed." *Id.* at 102–103. Detective Dickherber also

- 33 -

testified that at the end of questioning he asked Petitioner if he understood his rights, and Petitioner responded something to the effect of "am I under arrest?" *Id.* Detective Dickherber testified that he responded, yes you are arrested – but did not follow up or get an affirmative response from Petitioner regarding whether he understood his rights, or if Petitioner waived his rights. *Id.* at 103–104. Petitioner never actually stated that he understood his *Miranda* rights or waived them, but he gave a statement following his arrest. Doc. [27-1] at 104. After the hearing, the trial court found that Petitioner's statement was voluntary, but it granted the motion to suppress because "you have to make a finding that he understood his rights to find an applied waiver, and I don't think I can make a finding that he understood his rights to find an applied waiver, and I don't think I can make a finding that he understood his rights." Doc. [27-1] at 132. As such, the trial court excluded Petitioner's statement at trial. *Id.*; Doc. [27-5] at 52. Petitioner did not previously raise these claims in state-court proceedings or provide any evidence that Detective Dickherber's testimony at the suppression hearing was false or how the trial court judge allegedly, "altered the public record . . . ." Doc. [1-1] at 1.

To receive habeas relief based on these allegations, Petitioner would have to show "that: (1) the prosecution used perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is a 'reasonable likelihood' that the perjured testimony could have affected the jury's judgment." *United States v. Martin*, 59 F.3d 767, 770 (8th Cir. 1995) (citations omitted). Petitioner provided no evidence that the prosecution knew of any false testimony, that the prosecution used any alleged perjured testimony, or that it impacted the jury's decision. Petitioner has failed to show cause and actual prejudice or actual innocence in his conclusory statements and threadbare arguments. Ground 6 is procedurally defaulted and denied.

**Ground 7: Petitioner claims that Jake Dwyer responded to a leading question from the prosecutor in front of the jury that "defendant had been in prison."**

In Ground 7, Petitioner appears to argue that the trial court erred in not declaring a mistrial when James Dwyer testified that "[Petitioner] had been in prison." Doc. [1-1] at 2. During trial, the State called Dwyer to testify about the events leading up to the robbery and assault. Specifically, in response to the State's question: "Q. And what had the person, [Petitioner] told you about himself? A. He was bragging about smoking crack and that he had been in prison and that he was – [District Defender Reynolds] Objection. Side bar." Doc. [27-4] at 48. Petitioner's counsel then immediately moved for a mistrial. *Id.* The trial court denied the motion but asked the jury to disregard the prosecutor's question and Dwyer's answer. *Id.* at 49. While Petitioner challenged the trial court's decision in his motion for new trial, which was denied, Doc. [27-9] at 57, Petitioner did not raise a claim challenging the admission of Dwyer's testimony or the trial court's failure to declare a mistrial on direct appeal. Doc. [27-10].

Both Missouri's courts and federal courts review a trial court's refusal to declare a mistrial for abuse of discretion. *State v. Parker*, 476 S.W.2d 513, 516 (Mo. 1972); *United States v. Wilson,* 565 F.3d 1059, 1069 (8th Cir. 2009). Appellate courts "defer to the discretion of the trial court, particularly in the absence of any showing of actual bias." *Id.* Such deference is especially important here, where the state trial court was in the best position to observe the situation and determine the impact of Dwyer's testimony. The trial court determined that the drastic remedy of a mistrial was not warranted and instead opted to instruct the jurors to disregard the question and answer that contained Dwyer's objectionable testimony. The Court must presume the jury followed the trial court's instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Petitioner offers no evidence whatsoever to overcome that presumption or the deference this court owes the state trial court. Dwyer's testimony was brief, there is no indication

that it was purposely introduced by the State, and the State did not make any further reference to Petitioner's previous prison commitments. Petitioner has failed to show cause and actual prejudice or actual innocence in his conclusory statements and threadbare arguments. Ground 7 is procedurally defaulted and denied.

**Ground 8: Petitioner argues that four witnesses became unavailable because of unnecessary delays in the trial.**

In Ground 8, Petitioner alleges that unnecessary delays in trial caused the loss of four witnesses due to unnecessary delays in trial. To the extent that Petitioner is arguing his right to a speedy trial was infringed (by claiming that potential testimony from the Lindseys was lost due to trial delay), the Missouri Court of Appeals addressed that claim and denied it in Petitioner's direct appeal. Doc. [27-13] at 28–30. As such, Petitioner properly presented it in state court, and it should be denied for the reasons discussed in Ground I, *supra*. The only other information Petitioner provides in Ground 8 is that Takia Williams and Kevin Nevels "lived at [the motel] and were in and out of Room 235 where [the] crime occurred on May 10, 2013." Doc. [1-1] at 3. Petitioner's motion for new trial contained a claim that the trial court erred when it denied defense counsel's request to continue the case to locate and subpoena Nevels and Williams. Doc. [27-9] at 11–13. However, Petitioner did not raise this claim on direct appeal and only made the statement set forth above. Petitioner has failed to show cause and actual prejudice or actual innocence in his conclusory statement in Ground 8. Ground 8 is denied.

<u>**CONCLUSION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that the petition of David E. Smith for writ of habeas corpus, Doc. [1], pursuant to 28 U.S.C. § 2254 is **DENIED**.

**IT IS FINALLY ORDERED** that the Petitioner has not made a substantial showing of a denial of a constitutional right, and this Court will not grant a certificate of appealability.

A separate judgment in accordance with the Memorandum and Order is entered this same date.

Dated this 29th day of September, 2022.

MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE